## Case No. 13,541.

### STRONG v. CERTAIN QUANTITY OF WHEAT.

[2 Amer. Law Reg. (N. S.) 287; 4 West. Law Month. 82.]

District Court, N. D. New York. 1863.[1]

DEMURRAGE — DELIVERING AT ANOTHER PORT —
CUSTOM—BILL OF LADING—FREIGHT.

1. A carrier, finding, on his arrival at the end of his portion of the route, that an unusual press of business there would prevent his delivery of his freight for several days, is not thereby justified in taking the goods to another place and forwarding them from there to the consignees.

2. A cargo was shipped to a certain port, to be there forwarded by railroad to the consignees. The master of the vessel, after waiting two days and finding that his vessel could not be discharged for several days more, sailed to another port in the same state, and discharged his cargo there: *Held*, that his claim for demurrage at the first port could not be allowed.

3. The custom of the lake ports, that on the failure of the consignees to provide for the delivery of the property consigned to them for twenty-four hours after the report of its arrival, the master of the vessel was entitled to store the freight subject to charges at the nearest port, would not be a reasonable custom at Port Colborne, where there was no facility for the discharge of the cargo except at one place, and there was some proof of the custom of the port for vessels to wait their turn at that place.

4. Though the charter-party is ordinarily the controlling evidence of the contract as to everything clearly expressed therein, and bills of lading are often regarded as little more than evidence of the shipping and receipt of the cargo, yet, where the charter-party is not proved, or where it makes no provision in regard to the consignee or mode of delivery, the bills of lading become the proper and controlling evidence, in whole or in part, of the contract.

5. Freight is usually payable when it has been fully earned by the safe carriage and right delivery of the cargo.

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

[1] [Affirmed by circuit court; case unreported. Decree of circuit court affirmed by supreme court in 3 Wall. (70 U. S.) 225.]

[This was a libel for freight and demurrage by Heman Norton Strong against a certain quantity of wheat, the cargo of the Convoy; Frederick T. Carrington and William J. Preston, claimants.]

HALL, District Judge. The libel in this case was filed to compel the payment of freight, on the cargo proceeded against, from Chicago to Port Colborne, and thence to Buffalo; demurrage for two days' detention at Port Colborne; and sundry expenses incurred by the unlading, storage, and insurance of the cargo at Buffalo.

The bills of lading for the cargo were in the following form:—

"Chicago, August 18, 1860.

"Shipped in good order and condition, by E. G. Wolcott, on board the schooner Convoy, of ——, whereof —— is master, the following articles, marked and numbered as in the margin, to be delivered in like good order and condition (the dangers of navigation only excepted) unto consignees as per margin, or to his or their assigns. Freight and charges to be paid as noted below, upon the actual and complete delivery of the said goods and freight to said consignees or their assigns. In witness whereof the master of said vessel hath affirmed unto three bills of lading all of this tenor and date, one of which being accomplished the others to stand void.

| ACC.<br>J. H. Burch & Co.<br>Care<br>Carrington & Preston,<br>Oswego, N. Y.<br>*via*<br>Welland Railway from Port Colborne to Port Dalhousie, thence by sail or steam vessel to Oswego." | 16.014 35-60 Bushels No. 1 Spring Wheat (16.014 35). Freight to Port Colborne eight and one-half cents per bushel. |

The bill of lading copied above was signed by E. G. Wolcott as agent of the shippers; and three other copies were signed by the master of the Convoy. The copy of the bill of lading annexed to the answer of the claimant is in substance the same, except that the name of "Alex. McKirdy," as master, is inserted in the body of the bill, that the name of "Alex. McKirdy" is signed at the bottom, and that under that signature is the following entry: "Freight from Port Colborne to Oswego four and one-half (4½) cents per bushel—to be shipped from Dalhousie by steam or sail vessel classing not below standard. Dangers of navigation excepted. For Welland Railway, Walker & Brother, Agts." There is no proof in regard to this entry, and it does not appear that at the time of the execution of the bills of lading, the agent·or master of the Convoy knew that any special contract had been made for the transportation of the cargo of the Convoy over the Welland Railway. It must therefore be assumed that their knowledge of the final destination of the cargo, and of the mode of its transportation from Port Colborne, via the Welland Railway, to Oswego, was wholly derived from the entries in the bill of lading, so signed by the agent of the shipper, and similar bills of lading signed by the master of the Convoy. The Convoy, with her cargo on board, reached the western terminus of the Welland Railway, at Port Colborne, on Lake Erie, on the 28th of August, 1860, between 9 and 10 o'clock in the evening. The next morning her arrival was reported to the agents of the Welland Railway Company, and, during that day and the next, the master of the schooner and the agent of her owner several times desired the agents of the company to discharge the vessel, or to fix some specific time for her discharge. The agents of the railway company declined to do either; stating that they could discharge vessels only in the order of their arrival, and that the Convoy should be discharged in her turn, as soon as the other vessels which had arrived before her and were then awaiting their turn could be discharged. There was an unusual and extraordinary press of business at the Welland Railway Company's elevator at Port Colborne, and though vessels were discharged as rapidly as the capacity of the elevator and railway would permit, there was at that time an accumulation of vessels and consequent delay in their discharge. There was no other elevator or place of storage at Port Colborne, and if the Convoy was to be discharged there she would necessarily be discharged at the elevator of the railway company, or by hand labor. If discharged by hand labor, there was no means of storing the cargo there; and it would have been exposed to injury and loss. When the Convoy arrived there were twelve or thirteen vessels waiting to be discharged, and as two vessels were usually discharged in each twenty-four hours, the Convoy, if she had been discharged in turn, would have been discharged on the sixth or seventh day after her arrival—or about the 4th day of September. There was no agent of the consignees at Port Colborne, but there was telegraphic communication between Port Colborne and Oswego, where the consignees resided. No instructions were asked of the consignees and no information was sent them by the master of the Convoy, who, with his vessel, remained at Port Colborne until the afternoon of the 30th of August. He then sailed for Buffalo, which was the nearest port at which storage for the wheat could be obtained. The Convoy reached Buffalo the same evening, and the next day discharged her cargo at an elevator, her master taking a receipt for the wheat to be delivered to his order.

The day after the cargo was discharged the libellant, as owner of the Convoy, sent a telegram from Buffalo to the consignees at Oswego, in the following terms: "Buffalo, Sept. 1, 1860. To Carrington & Preston: Obliged to store cargo Convoy in the Hatch Elevator in this city. Shall libel cargo for freight, demurrage at Port Colborne, and freight and charges here, unless settled immediately. Answer. H. N. Strong, Owner Convoy." On

the receipt of this telegram the claimants despatched an agent to Buffalo, who offered to pay freight to Port Colborne and fifty or one hundred dollars in addition, but the libellant demanded $300 in addition to the freight provided for on the bill of lading. No settlement was made, and on the 5th of September, 1860, the libel in this case was filed.

On the hearing it was insisted, on behalf of the libellants, that the Convoy was chartered for the trip from Chicago to Port Colborne, to carry the wheat which constituted her cargo; that the bill of lading, subsequently executed, was therefore to be regarded only as a mere receipt for the wheat; that the charter-party, and not the bill of lading, was to be looked to as containing the contract of affreightment. between the parties; and that if there was anything in the bill of lading to prevent the recovery of freight immediately on delivery of the cargo at Port Colborne, or relieve the owners of the cargo from the duty of receiving it there on the vessel's arrival, the bill of lading ought to be reformed so as to make it correspond with the alleged charter-party. The libellants also offered and gave (subject to the claimants' objection) proof of the custom of the lake ports in respect to the disposition to be made of freight when the consignee does not provide for its reception within twenty-four hours after he is informed of its arrival. This evidence will be more particularly detailed hereafter, and its effect considered.

The allegations of the libel, so far as they relate to the alleged charter of the Convoy, are, in substance, that on the 18th day of August, 1860, E. G. Wolcott, the agent of the owners of this cargo, shipped, and the master and owner of the Convoy received on board that vessel, the wheat before mentioned, which the shipper agreed should be carried, and which the said schooner, master and owner, agreed said schooner should carry from Chicago, aforesaid, to Port Colborne, in Canada, for the freight mentioned in a bill of lading, which was on the said last-mentioned day duly executed and delivered in triplicate; that it was agreed that said wheat should, pursuant to said bill of lading and contract, be carried to and delivered at Port Colborne, and that all the parties to such bill of lading and contract of affreightment (except said schooner, master and owner) agreed that they would receive the said cargo from the said schooner on her arrival at said Port Colborne, and would then and there relieve the said schooner therefrom, and pay the freight thereon from Chicago to Port Colborne aforesaid, and also, that the said schooner, master and owner did not, nor did any or either of them, ever, in fact, agree to carry said property from said Chicago to any other place than said Port Colborne, but did agree to carry said wheat from said Chicago to said Port Colborne, and there deliver the same —as the same as aforesaid was agreed to be received—to be carried from thence as in

said bill of lading mentioned. The libel also further alleges that if the said bill of lading expressed any other or different agreement, the same was so expressed by mistake, and it prayed that the same—the said bill of lading—might be reformed and altered to conform to the contract of affreightment as aforesaid made.

The only evidence to sustain the allegation that there was a contract of charter prior to and independent of the contract evidenced by the bill of lading, is to be found in the deposition of Mr. Goodnow, the agent of the libellant, and the deposition of Mr. Wolcott, the agent of the claimants, by and between whom the arrangements for the carriage of the wheat were made. The agent of the libellant says: "On or about the 18th day of August, A. D. 1860, I, as agent of H. N. Strong, chartered the schooner Convoy, which was then at the port of Chicago, to Mr. E. G. Wolcott, a commission merchant on South Water street, Chicago, Illinois, to carry a cargo of wheat from Chicago to Port Colborne, in Canada, at eight and one-half cents per bushel freight. This is the cargo now in controversy in this suit. At the time of making said contract, or charter, no other destination or port was named but Port Colborne. Mr. Wolcott made out some bills of lading for me, leaving the number of bushels of wheat blank for the captain to sign, as she would not be loaded until after office hours. The captain signed the bills of lading and I took them to the office of Mr. Wolcott, the next morning. The bills of lading signed by the captain were three in number. The fourth bill of lading annexed to the deposition as exhibit A, is signed by the shipper, E. G. Wolcott, and is an exact copy of the three bills of lading signed by the captain, with the exception of the names of the signers. At the time the cargo was shipped and the bills of lading were signed, there was no contract or any other understanding of whatever kind for the transportation of the cargo to Oswego or any other port. It was only from Chicago to Port Colborne that said contract was made for." The agent of the claimant says: "I contracted with Mr. Goodnow for the schooner Convoy, about the 18th of August, 1860, to take a cargo of wheat from Chicago to Port Colborne, and I think I made a contract with one of the Mr. Walkers to take it from there through to Oswego. Walker was agent of the Welland Railway Company." * * * "My only conversation or understanding with Mr. Goodnow was in relation to Port Colborne only, and that was the contract made with Goodnow, from Chicago to Port Colborne."

There is nothing in this testimony or in the other testimony in the case to justify this court in disregarding or modifying the contract evidenced by the bill of lading. There was probably a simple agreement that the vessel should take a cargo of wheat to Port Colborne at 8½ cents per bushel. Leaving

the details of the contract to be determined by the custom and usages of shippers, masters, and vessel-owners, at Chicago, and looking to the execution of a bill of lading as the final evidence of the terms of the contract; or it may be that the bills of lading which were prepared with a blank for inserting the quantity of wheat, after the cargo was put on board and the quantity ascertained, were prepared at the time of the first agreement as evidence of the contract agreed to by the agents of the parties. This testimony of the agents of the parties should not therefore control or affect the bill of lading in this cause.

It is true that bills of lading, signed by the master of a vessel, under a charter-party for the voyage, are often regarded as little more than evidence of the shipping and receipt of the cargo, and that the charter-party is ordinarily the controlling contract as to all the terms or provisions clearly expressed therein. Pars. Mar. Law, 240, 241. But where a written charter-party makes no provision in regard to the consignee or mode of delivery, the bills of lading, which supply the omission, cannot be deemed inoperative and invalid, because of the pre-existing charter-party. But in this case there is no evidence of a charter-party. If the cargo had been lost or damaged prior to its arrival at Port Colborne, the liability of the owners of the Convoy would not have been that of bailees to transport for hire, under a charter-party—who are only bound to the use of ordinary skill and care;—but the greater and more stringent liability of shipowners and carriers. The contract made by the agents of the parties was a contract for the carriage of the wheat, not the charter of the Convoy; and the bill of lading is, therefore, the proper and controlling evidence of the contract.

The bill of lading shows that the Convoy was to carry the wheat only to Port Colborne; at least this is apparent when the terms of the bill of lading are considered in connection with the proof that if the wheat was transported to Oswego, via the Welland Railway, it must necessarily leave the vessel at Port Colborne. The parties who made the contract knew this. They stipulated for the freight to Port Colborne only; they provided for a different mode of transportation beyond; and they knew that on the arrival of the vessel at Port Colborne, she would, in the ordinary course, and according to the custom of that port, be discharged at the elevator of the Welland Railway Company. The master who signed the bill of lading had been at that port frequently, and he knew that the wheat, if discharged there and sent forward by the Welland Railway, must necessarily be delivered at that elevator, unless the tedious and expensive process of unloading by hand labor was adopted.

Doubtless both parties expected and intended the vessel should be discharged at the elevator. The shipper did not expect that the cargo would be delayed by the slow process of discharging the wheat by manual labor, and the shipowner did not expect to incur the expense of manual labor for that purpose. The Welland Railway Company was one of the carriers on a portion of the line of transportation over which the wheat was intended to pass (as appeared upon the face of the bill of lading signed by the master under the inspection of the agent of the Convoy), and both parties expected that the railway company would receive and transport the cargo of the Convoy over their road. They equally relied on the ability of the railway company to receive and forward the cargo without delay; and they doubtless were equally disappointed when it was found that in consequence of an unusual and extraordinary press of business, at Port Corborne, several days must elapse after the arrival of the vessel before she could be discharged.

The testimony shows that the railway company discharged the vessels at Port Colborne in their turn, according to the order of their arrival, and as rapidly as their means would allow; that the Convoy would have been discharged in her turn, as soon as all other vessels waiting for their discharge at the time of her arrival, had been discharged; and that she would have been so discharged in from six to eight days after her arrival. She remained at Port Colborne two days and three nights, for which her owner now claims $150 demurrage, and then, there being no means of immediately storing her cargo at Port Colborne, she came to Buffalo and put it in store in this city.

In determining the rights of these parties in regard to the disposition of the cargo of the Convoy, under the contract evidenced by the bills of lading and the peculiar circumstances of this case, it is proper here to consider the proof of the custom of the lake ports, which it was insisted justified the course taken by the master of the Convoy. The libellant's witnesses stated in substance, that it was the custom of many of the lake ports—and so far as they knew at all of them—for the master of a vesssel to report her arrival with freight, and to allow the consignees twenty-four hours to provide for the delivery and receipt of the property consigned to them, and that if the consignees were not, at the end of that time, prepared to receive the freight, the master of the vessel was entitled to store it, subject to charges, at the nearest point. It was not, however, stated by these witnesses, that they could mention any case where a vessel had left the port of destination, under such a custom. The agent of the libellant admitted he could not do so, and that the information he had in regard to the custom at Port Colborne was, that it was there the custom for vessels to wait their turn to be discharged.

It is true that in the absence of express agreement, the duty of the master in the delivery of freight must necessarily be determined by the custom which regulates the mode of de-

livery at the port of discharge. In the absence of express contract, the parties are presumed to have contemplated a delivery according to the established custom. And proof of a custom prevailing at most of the ports on the Great Lakes, without any countervailing proof in respect to the other ports, might be sufficient proof of the custom, at other ports on the same lakes, under similar circumstances. If there was no reason for presuming the existence of a different custom, the general usages and customs of the lake ports might, in the absence of all proof in respect to the particular port, be presumed to prevail there also; but in this case there is some proof of a different custom at Port Colborne.—a custom to discharge vessels in the order of their arrival. Port Colborne, as a commercial port, is very different from the other lake ports, and the custom proved which is reasonable and proper at other ports, is not likely to be adopted at that port. Considering the peculiar character of the port and of its business, and especially the fact that it has no facilities for discharging vessels or storing their cargoes, except such as are furnished by the elevator of the Welland Railway Company, no custom except for vessels to wait their turn can be considered as just or reasonable; and no other custom can, under the proofs in this case, be considered as having been within the contemplation of the parties by whom the contract of affreightment in this case was made. The master of the Convoy and the agent of her owner knew, as well as the shipper and owned of the cargo, what means of discharging the vessel were to be found at Port Colborne, and if, when the contract of affreightment was proposed, they were unwilling to take the danger of delay consequent upon this mode of discharging this vessel, they should have provided against it by stipulating for demurrage.

I am therefore of the opinion that the master of the Convoy was bound to deliver his cargo to the Welland Railway Company, and to wait his turn for the delivery of his vessel. But if the master of the Convoy was not bound to remain at Port Colborne until his vessel could be discharged in its order, he did not do what he ought to have done, before taking the cargo to Buffalo and there storing it. There was telegraphic communication between Port Colborne and Oswego, where the consignees of the wheat resided, and during the time he remained at Port Colborne information of the delay and its cause could probably have been sent to the consignees, and their instructions received in return. The consignees might have offered a fair demurrage or have given special instructions for the disposition of the wheat; and it was the duty of the master to endeavor to communicate with the consignees, when it was probable that their instructions could be readily obtained. If, when a cargo reaches the port of destination at the residence of the consignee (who is presumed to know that his interests will require attention on its arrival), the shipmaster, in the absence of any

particular custom, is bound to use due diligence to find the consignee and obtain his instructions, before he assumes to put the cargo in store, on the ground that no other proper delivery can be made, it would seem to be more clearly his duty to use due diligence to obtain the consignee's instructions, in regard to the disposition of the cargo, where the difficulty in carrying out his contract of affreightment, as originally contemplated, arises at an intermediate port, where the consignees were not expected to be present, either in person or by their agents.

The disposition of the cargo by the master requires, at all times, the utmost caution on his part. He should always bear in mind that it is his duty to do all in his power to carry out, to the extent of his engagement, the prime object of his employment—the forwarding of his freight, by the route and means agreed upon, to the place of its final destination. It is for this purpose that he has been intrusted with it, and this purpose he is bound to endeavor to accomplish, by every reasonable and practicable effort, until he has delivered his freight according to his contract, or such delivery has become entirely impracticable. Even at the port of final destination and the presumed residence of the consignee, he is bound to make every reasonable effort to deliver the cargo personally to the consignee, or in accordance with the known and established customs of the port; which customs are presumed, in the absence of express agreement, to be within the contemplation of the parties, and to be, by their tacit consent, silently introduced into the contract of affreightment. If he is required to do this at the port of final destination and the place of business of the consignee, he cannot be required to make less effort to perform his contract and protect the interests of the absent owner, in an unforeseen emergency, at an intermediate point, where the consignee was not expected to be present, but necessarily relied upon the acts of another carrier having exclusive control of the means of carriage over a portion of the line of transportation. Good faith, the interests of commerce, and a wise public policy equally require that the master should do all in his power to protect the interests of freighters in such unforeseen and extraordinary emergencies, and the master of the Convoy should not have diverted the wheat of the claimants from the line of transportation they had chosen, and have thereby subjected it to unusual and unexpected charges, and exposed its owners to a prosecution for a breach of their contract with the Welland Railway Company, until he had attempted by telegraph to communicate with the consignees.

It was contended on the argument that under the bill of lading in this case no freight could be demanded until the delivery of the wheat to the consignees at Oswego, the port of final destination, but in the view I have taken of this case it does not become necessary to decide the question. It may possibly be doubtful

what would be the true construction of the bill of lading independent of any custom;—and also whether the custom for the different carriers along the same line of transportation, to advance to each preceding carrier all accrued freight and charges and receive the goods and merchandise, subject to such charges, to be collected with their own charges, on delivery to the next carrier or the consignee, has been so long and so well established, and so often proved in court, as to require this court to take judicial notice of such custom without proof in the particular case. It is probable that this custom was understood by the parties in this case, and that they intended it should be acted upon; and it is most likely that it was not intended or expected that the freight earned by the Convoy should either remain unpaid, after the delivery of the wheat at Port Colborne, or be advanced by the consignees before the wheat reached Oswego. All parties doubtless supposed it would be advanced by the Welland Railway Company, according to the known and established custom.

Independent of the custom and looking to the bill of lading alone, I am not prepared to say that the consignees were bound to pay freight before the wheat arrived at Oswego. Freight is usually payable when it has been fully earned by the safe carriage and right delivery of the cargo, and if the bill of lading had simply provided for the payment of the Convoy's freight on delivery, the delivery referred to would have been the delivery by her at Port Colborne. But such is not the provision in the bill of lading. The freight is declared to be payable "upon the actual and complete delivery of said goods and freight to said consignees or their assigns"—and it is clear that the delivery to the consignees was to be at Oswego and not at Port Colborne.

What would have been the effect upon the rights of the parties of an absolute refusal on the part of the Welland Railway Company to receive the wheat or advance the freight of the Convoy, and what would have been the duty of the master under such circumstances, it is not now necessary to decide, for the railway company did neither, and only asked that the Convoy should wait her turn, and be discharged in her order. The libel is dismissed, with costs.

NOTE. This case, for which we are indebted to the courtesy of Judge Hall was decided by him in the early part of last year, and taken to the circuit court on appeal. At the October session, 1862, the opinion of that court was delivered briefly by Mr. Justice Nelson, affirming the decree upon the opinion of Judge Hall in the court below. [Case unreported. An appeal was then taken to the supreme court, where the decree of the circuit court was affirmed. 3 Wall. (70 U. S.) 225.] The case was of importance, not only as it affected the right of the shipmaster to change the port of delivery and forward his freight to the consignees by a route different from that laid down in his contract, but also as it involved, to some extent, the judicial recognition of customs claimed to be established at the lake ports. The particular custom alleged was for the master of a vessel to report her arrival and allow the consignees twenty-four hours to provide for the delivery and receipt of the cargo, and in case they failed to do so in that time, the master to be entitled to store the freight, subject to charges, at the nearest point. The reasonable character of such a custom is discussed, though not expressly decided upon, the proof having failed to come up to the point claimed by the libellant, and there being some evidence that the custom of the particular port named in the contract was different and was known to all the parties. While the general principle is abundantly well settled, that the custom of the trade or the usage universally attached to the subject-matter in the place where the contract is made, may be used as evidence to explain the ambiguities or supply the omissions of defective contracts (Add. Cont. 851; 1 Greenl. Ev. § 292); and though the decisions draw a clear line of distinction between a custom modifying general contracts, which must be long-continued, even from time immemorial, and a usage of trade which may be of recent origin (Barton v. McKelway, 2 Zab. [22 N. J. Law] 165; Knowles v. Dow, 2 Fost. [N. H] 387; Townsend v. Whitby, 5 Har. [Del.] 55), yet it is important to bear in mind that even in the case of mercantile usage this rule was meant for a general, uniform, notorious, and reasonable course of trade in long-established commercial communities, and should be applied with great caution to avoid fettering the commerce of our growing towns by hasty judicial recognition of their early crude and temporary customs. See Harper v. Pound, 10 Ind. 32; Wall v. East River Mut. Ins. Co., 3 Duer, 273; and the remarks of Judge Story in the case of The Reeside [Case No. 11,657].